IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Miami Division)

ZOHRA KHORASHI,

      Plaintiff,

vs.

CHARTWELL LAW OFFICES, LLP,

      Defendant.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff, Zohra Khorashi, hereby sues Defendant, Chartwell Law Offices, LLP, and states as follows:

## Introduction

1.    This is an action by Zohra Khorashi against her former employer, Chartwell Law Offices, LLP, for discrimination based on her race, national origin and religion and for retaliation in violation of 42 U.S.C. §1981 and the Florida Civil Rights Act of 1992.  By the filing of this action, Khorashi seeks damages and a reasonable attorney's fee.

2.    This case arises from Defendant's differential enforcement of its workplace policies and escalating scrutiny of Plaintiff after she engaged in protected activity and expressed viewpoints as a Muslim Pakistani attorney that were not shared by Defendant's leadership.  Plaintiff was subjected to reduced work, demotion, heightened monitoring of her personal social media, and ultimately termination, while similarly situated non-Muslim and non-Pakistani

employees engaged in comparable or more controversial social media activity without discipline. Defendant's stated justification: reputational harm and employee safety concerns, was applied selectively and only after third-party online backlash targeting Plaintiff. The sequence of events, including Defendant's knowledge of Plaintiff's protected complaints, its increased monitoring of her speech, and its materially different response to comparable conduct by other employees, supports a reasonable inference that Defendant's stated reasons for Plaintiff's demotion and termination were a pretext for discrimination and retaliation.

## Jurisdiction

3.     This action arises under 42 U.S.C § 1981 and the Florida Civil Rights Act of 1992, § 760.11, Fla. Stat.  The Court has jurisdiction over the federal claims pursuant to 29 U.S.C. §§ 1331, 1343(4) while jurisdiction over the state law claims is based on 28 U.S.C § 1367.

4.     The claim arose in Miami-Dade, County, Florida, in the Miami Division of the United States District Court for the Southern District of Florida, which is where venue is proper.

## Parties

5.     Plaintiff, Zohra Khorashi ("Plaintiff" or "Ms. Khorashi") is a resident of Miami-Dade County, Florida, who was formerly employed as an attorney by Chartwell Law Offices LLP at its office located in Miami, Miami-Dade County Florida, until her termination on February 29, 2024.

2

6.     Based on her Asian ancestry and Pakistani national origin Plaintiff is among the person protected under 42 U.S.C § 1981 in the making, performance, modification, and termination of contracts of employment and against impairment by nongovernmental discrimination.

7.     Ms. Khorashi was an "employee" as defined by the FCRA who is protected from discrimination with respect to compensation, terms, conditions, or privileges of employment based on her sex (female), national origin (Pakistan), religion (Muslim) and her objections and opposition to unlawful practices in the workplace that she reasonably believed were in violation of the FCRA.

8.     Defendant, Chartwell Law Offices LLP (hereafter "Defendant" or "Chartwell") is a Pennsylvania Limited Liability Partnership and an "employer" as defined by the FCRA, which had more than 15 employees in its Miami and Deerfield Beach offices where Plaintiff worked prior to her termination.

### Compliance with Procedural Requirements

9.     Following her termination on February 29, 2024, Ms. Khorashi timely filed a Charge of Discrimination with the Miami Office of the United States Equal Employment Opportunity Commission and the Florida Commission on Human Relations on April 17, 2024, which raised claims against Defendant Act for discrimination based on race, sex, religion and national origin and retaliation under Title VII of the Civil Right Act of 1964, as amended, and the Florida Civil Rights of 1992. A copy of Plaintiff's EEOC Charge No. 510-2024-06435 is attached as Exhibit 1 and incorporated by reference herein.

10.     As of the date of the filing of this Complaint, more than 180 days have passed since the timely submission of Plaintiff's Charge of Discrimination and the EEOC has failed to conciliate or determine whether there is reasonable cause to believe that discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992. Plaintiff has therefore exhausted her administrative remedies under the FCRA and is entitled to bring a civil action in this Court pursuant to § 760.11(8), Fla. Stat..

11.     All other conditions precedent to the filing of this action have occurred, have been fulfilled or have been waived.

12.     Plaintiff has retained the undersigned attorneys to represent her in this action and is obligated to pay a reasonable fee for their services.

### Factual Allegations

13.     In or about September 2018, Plaintiff Zohra Khorashi was hired by Defendant Chartwell for the position of associate attorney in the Firm's Miami office, located 100 S.E. 2nd Street #2150, Miami, FL 33131.

14.     Plaintiff was initially assigned to work under the supervision of a partner named Derek Lloyd in Chartwell's Miami and Deerfield Beach Office. During the first four years that she worked with Mr. Lloyd, Plaintiff met her requirements for billable hours and received no significant criticism regarding her work, but over time, Ms. Khorashi noticed that Mr. Lloyd gave her significantly fewer assignments to attend court hearings or take depositions and only minimal opportunities to engage and interact with clients.  Meanwhile, Mr. Lloyd would

routinely allow other non-Pakistani and non-Muslim associate attorneys assigned to his files to cover hearings, take depositions, attend mediations and interact directly with his clients.

15.    In or about September 2022, Ms. Khorashi asked Derek Lloyd about the unequal distribution of work assignments among the associates under his supervision, and why she was consistently denied the same opportunities to attend hearings, take depositions and interact with clients.  Without offering any specifics, he simply dismissed her questions and told her there were "strategic reasons" and he would therefore not allow it.

16.    A few weeks their initial discussion regarding work assignment, Plaintiff advised Derek Lloyd in October 2022 that she and other women of color were being subjected to what they felt was pattern of bullying and demeaning treatment by Victoria Godwin, a white female associate attorney in the Deerfield Beach Office.

17.    As Plaintiff's immediate supervisor and an equity partner in the Firm's Deerfield Beach Office, Mr. Lloyd was specifically designated in Chartwell Law's Employee Handbook as the initial point of contact for employee complaints of harassment or discrimination at work.  In accordance with Defendant's policies for reporting discrimination, she provided Mr. Lloyd a detailed account of the alleged harassing conduct, the names of other employees who may have experienced similar harassment, and any other individuals who observed or witnessed the harassment.

18.     Instead of investigating Plaintiff's concerns or referring the discrimination complaint to Human Resources, Mr. Lloyd reacted by falsely accusing her of fabricating the allegations against Victoria Godwin to deflect from her own poor performance and unacceptable billing practices.

19.     After falsely accusing Ms. Khorashi of improper billing and poor job performance, Mr. Lloyd gave her a choice:  if she did not accept a demotion to part-time status, he would place her a formal performance improvement plan (PIP) to monitor her work and billing.  His threat to impose a PIP if she did not accept a demotion completely ignored the progressive "Disciplinary Procedure" in Chartwell's Employee Handbook, which describes a four-step process the Firm can follow to address alleged performance problems which must be documented in the employee's personnel file.  There is an option of a written Performance Action Plan executed by the employee and supervisor at Step 2 of the disciplinary process, but Mr. Lloyd did not even attempt to comply with this policy before he threatened Ms. Khorashi in response to her discrimination complaint against Victoria Godwin.

20.     On or about November 22, 2022, Plaintiff submitted a formal complaint to Human Resources about alleged discrimination by Derek Lloyd and Victoria Godwin and advised HR that if she had to defend herself against the retaliation by Derek Lloyd, she had emails and other evidence showing that he and Ms. Godwin were the ones engaging in fraudulent billing practices, including but not limited to: billing the clients for work that had not been done; overbilling for review or revision of work completed by an associate of for which there were

templates and forms not requiring a new creation of document; and falsely crediting themselves for the work done by associates so that it could be billed to the client at the higher hourly rate for partners.

21.     After learning of Ms. Khorashi's complaint to HR in November 2022 Derek Lloyd and Victoria Godwin escalated their retaliation against Plaintiff as they tried to push back against her credible, documented and very serious allegations that they had each engaged in fraudulent and dishonest billing practices.

22.     In addition to falsely accusing Plaintiff of improper billing in response to her HR complaint and continuing to decrease her work assignments, Derek Lloyd began to use his position and influence within the Firm to persuade other partners to avoid giving work to Ms. Khorashi if she asked them for assignments. By freezing Plaintiff out of other opportunities Mr. Lloyd hoped to reduce Plaintiff's total work hours to less than 30 per week, in which case she would be automatically classified as part-time under Chartwell's employment classification policy.  If her billable hours fell below 20 per week Plaintiff would lose her eligibility for even part-time employment and would be subject to termination under the Firm's policies.

23.     As her work assignments continued to dry up, Plaintiff tried to solicit work from other partners in Chartwell's Deerfield Beach and Miami Offices. Although none of the other attorneys had any prior basis upon which to question her knowledge, skills or experience as a fourth-year associate, due to the influence

of Mr. Lloyd, they gave her only entry-level work and did not even attempt to treat her as an equal to the other associates already on their teams.

24.     Between the end of November 2022 and March 2023, Ms. Khorashi sent at least ten emails to HR with complaints of discrimination, retaliation and additional evidence of fraudulent billing practices by Mr. Lloyd, Ms. Godwin and others.   Despite receiving multiple serious and credible complaints from Ms. Khorashi on these issues, HR failed to investigate or take any remedial action in accordance with Chartwell's policies.

25.     On or about March 8, 2023, Ms. Khorashi submitted another follow-up email to HR in which she noted the lack of response to her prior complaints and expressed concerns that Derek Lloyd and others were retaliating against her by deliberately reducing her workload and ability to meet her billable hours requirements to force her into a part-time status and set her up for termination.

26.     When several more weeks passed without an acknowledgement or response from HR, Plaintiff sent another email to HR in mid-April 2023, advising that she was still not being given enough work to meet her billable hours requirement even though Chartwell apparently had enough work to post a job opening on LinkedIn for a general liability associate in the Firm's Miami and Deerfield Beach Offices.  Plaintiff also expressed interest in working on more cases under the supervision of Anthony Renaldo, the managing partner of the firm's Deerfield Beach Office, with whom she worked on several cases and assignments

during the years she was primarily supervised by Derek Lloyd, and with whom she felt she would have a much better working relationship going forward.

27.     In response, HR advised Ms. Khorashi that most of the cases Mr. Renaldo worked on belonged to Mr. Lloyd and suggested that Plaintiff "clear the air" with Mr. Lloyd.  Although Plaintiff was deeply offended by the notion that she owed an apology to Mr. Lloyd for anything, she was desperate for work at that point and agreed to attend a Zoom call with Mr. Lloyd and HR.  The call took place in late April 2025, and, per HR's advice, after emotionally expressing her desire to simply work in a peaceful environment Ms. Khorashi apologized to Mr. Lloyd for any misunderstandings and asked that she be assigned to work under the supervision of Mr. Renaldo.

28.     On or about May 1, 2023, Ms. Khorashi spoke directly with Mr. Renaldo to update him  regarding the Zoom call with Mr. Lloyd and HR and discuss when she could resume work on his cases.   To avoid any potential misunderstandings or surprises, she and briefly summarized the multiple complaints she had made to HR about Mr. Lloyd over the previous several months and how, after taking no action in response to her concerns of discrimination, retaliation or fraudulent billing practices, HR advised that she make "amends" and apologize to Mr. Lloyd.

29.     After listening to her concerns about future retaliation, Mr. Renaldo said that  he hoped that would not be the case and agreed to see if he could get

Plaintiff more work on some of his files since he had several cases that were getting ready for trial.

30.     Following her conversation with Mr. Renaldo, Plaintiff spoke by phone with Jennifer Majewski from HR on May 8, 2023.  After confirming with Plaintiff that she had spoken to Mr. Renaldo and that he might need help with some cases which belonged to Mr. Lloyd, Ms. Majewski said that she would follow up and get back to her.

31.     After a few more weeks passed with no response from HR, Plaintiff called Mr. Renaldo herself on June 2, 2023 to express her continuing frustration about the lack of work assignments or assistance from HR.

32.     Almost immediately following her conversation with Anthony Renaldo on June 2, 2023, Ms. Khorashi noticed that she was suddenly being removed from the calendar for the few events that she was scheduled to cover for other attorneys over the next several weeks.  Without any explanation or prior notice, Matt Olmstead removed her from two cases he had assigned to her as an associate, followed by Sean Crosby taking her name off several depositions that Plaintiff was scheduled to cover for him in June and July in one of his workers' compensation cases.

33.     On or about June 5, 2023, Jenn Majewski reached out to Ms. Khorashi to schedule a Zoom call with her and Mr. Renaldo on June 9, 2023.

34.     Instead of discussing her complaints of discrimination or her requests for more work, Jenn Majewski opened the meeting by informing Plaintiff that the

equity partners at the Firm were concerned about her low hours and had therefore decided to demote her to a "part time" position where she would be paid $70 for every hour she billed, without any other benefits.

35.     When Plaintiff expressed her shock and disappointment at the decision and tried to bring up the issue of her prior discrimination complaints, Ms. Majewski claimed that the firm did its due diligence to get Ms. Khorashi work from different partners but for some reason the work was just not "sticking" and the partners who had been giving her assignments  no longer wished to work with her due to her alleged lack of interest in the work, poor work product, and unreliability.

36.     Plaintiff became extremely emotional on the call and asked why she was directed to apologize to Mr. Lloyd if he never had intentions of giving her more work.  Ms. Majewski said that although Mr. Lloyd appreciated the apology, the cases belonged to Mr. Lloyd, and he preferred keeping the team as it was, i.e., without Ms. Khorashi.

37.     When Plaintiff asked why none of the "concerns" being discussed in the call were ever raised with her prior to the meeting or in writing and asked for examples of any poor-quality work,  Ms. Majewski could not offer any answers and told Plaintiff that she would reach out to the dissatisfied partners and get back to her.

38.     Following the Zoom call on June 9, 2023, Ms. Khorashi called Sean Crosby, who was one of the few partners who seemed genuinely interested in trying to help Ms. Khorashi and provided her with work on his cases.  When his

11

assistant Lan took the call,  Plaintiff asked if she had any idea why she had been suddenly removed from covering events for Mr. Crosby.  Lan informed her that Amanda Bartley, a white female equity partner, had advised Mr. Crosby to reassign the work because Ms. Khorashi had advised Chartwell that she was leaving her employment with Firm. Ms. Khorashi had never advised anyone nor had the intentions of leaving the firm.

39.    When Plaintiff emailed Jenn Majewski to ask why people were spreading false rumors that she was leaving the Firm when she had never expressed any intention of doing so, Ms. Majewski responded with an invite for another Teams meeting on June 16, 2023, with herself, Plaintiff and Anthony Renaldo.

40.    During their second Zoom meeting, Ms. Majewski said that she had spoken with several equity partners about the basis for their recent criticism of Plaintiff -- including Amanda Bartley, Matt Olmsted, and Heather Hatch – and that she had received emails from them which they allegedly sent to Ms. Khorashi asking for the status of her assigned tasks, which they had claimed showed her lack of interest in the work they assigned to her.  Ms. Majewski declined to provide Ms. Khorashi with copies of the alleged emails or identify which specific assignments the partners were talking about, claiming that the dissatisfied partners wished her well but did not want to meet with her in person because they did not think it would be productive.

41.     Plaintiff was extremely upset and emotional at the conclusion of the Teams meeting.  Mr. Renaldo called her afterwards to apologize and said that he had not seen any of the emails that Jenn Majewski had referred to from the other partners.   Although he did not have his own case list that would allow him to directly assign work the Ms. Khorashi, he promised to continue his support and efforts to find work from other partners for her.

42.     On July 1, 2023, Ms. Khorashi was formally notified of her demotion from full time to part time based on the unsubstantiated false narrative from unnamed dissatisfied "equity partners" about her lack of interest in the work that they assigned to her, poor work product, and unreliability.

43.     The adverse action against Plaintiff was taken notwithstanding Defendant's failure to comply with any part of its own four-part progressive "Disciplinary Procedure" to address alleged performance problems, the lack of any performance deficiencies "documented in the employee's personnel file," and the lack of any written Performance Action Plan executed by the employee and supervisor at Step 2 of the disciplinary process.   At the time of Plaintiff's demotion, Defendant had sufficient work to employ Ms. Khorashi on a full-time basis but made no efforts to assist her in generating enough assignments to meet her monthly billable hours requirements.

44.     Following her demotion to part-time status, Ms. Khorashi continued her own efforts to generate work for herself, unassisted by HR.  Over the next several weeks, she emailed several partners in Florida who said on

13

LinkedIn that they were looking for an associate to assist with their caseload, but they either never responded to her or told her they did not have work for her.

45.     After being unable to generate sufficient work for herself in Florida, Ms. Khorashi eventually reached out to some of the Firm's out of state partners in the Atlanta office, including Douglas Burrell, Karen Karabinos and Robert Luskin.  Mr. Burell and Mr. Luskin gave her a few assignments before advising that the "higher ups" in the Firm were aware she had reached out to the Atlanta office and were questioning why she was being given any work. After Plaintiff told Mr. Burrell what happened to her following her complaints to HR, they discussed whether Chartwell might be trying to force her out by blocking any work assignments from the Atlanta partners.

46.     Even after Plaintiff advised Douglas Burrell of her multiple complaints to HR about discrimination and retaliation from several equity partners in Florida, he still wanted to designate her as the lead associate on his Uber files, a significant number of which were expected to come into the Florida region in December of 2023 or beginning of January of 2024.  In subsequent conversations, however, he told Plaintiff that the "higher ups" rejected his proposal to make her the lead associate on his Uber files, so they were assigned to Florida partner Kirstie Hayduk instead.  Because he was still a relatively new partner, Mr. Burrell indicated that he hoped to be able to offer her additional help by early 2024 if he was promoted to equity partner because he could directly assign his filed to her without needing anyone's approval.

47.     From August 2023 until the end of December 2023, Plaintiff continued to receive assignments from Anthony Renaldo, Doug Burrell and Robert Luskin, and although it was still not enough to meet her monthly billing requirements for a full-time associate, they all seemed pleased with her work.

48.     From the time she started working at Chartwell, Ms. Khorashi maintained an Instagram account called "thatlawyermomlife" and she was active on social media for several years before she even went to law school.  Plaintiff uses her real name on her Instagram page where she shares her personal experiences, insights and sense of humor as she juggles her dual roles as a Muslim parent at home with her full-time professional career as a practicing attorney.  Other than using the same picture that Chartwell Law uses for its Firm website, for her profile picture, there is nothing on Plaintiff's Instagram page that references Chartwell Law or identifies her as a member of the Law Firm

49.     In accordance with Defendant's policy for "Social Media Acceptable Use" and "Off-Duty Use of Social Media." Plaintiff's social media activity did not interfere with her work and her page was set for full public access so that Defendant could observe and monitor the content and information to ensure that it "was neither inappropriate nor harmful to Chartwell Law, its employees, or clients," did not "violate the firm's code of conduct" and made no negative references to the Firm or her employment with Chartwell

50.     When the armed conflict between Israel and Hamas erupted on October 7, 2023, Plaintiff, like millions of other Americans, started to post and

comment about the war on her social media accounts.  Plaintiff's social media posts about the Gaza conflict supported the Palestinian cause and as a mother of three young children, she expressed her opposition to the steadily increasing civilian casualties that she felt were being needlessly inflicted by the Israeli Defense Forces (IDF) on innocent Palestinians, especially women and children.

51.    As the Israeli/Palestinian conflict expanded and the siege of Gaza intensified, Ms. Khorashi's social media activity continued to focus on bringing attention to the tens of thousands of Palestinian women, children and other non-combatants who were being killed or subjected to food insecurity, lack of shelter, medical supplies and other humanitarian aid.  To present a more complete picture of the debate, in addition to re-posting pro-Palestinian memes and adding some of her own comments, she also re-posted unedited footage and statements of the pro-Israeli position from Israeli citizens, politicians, members of the Israeli Defense Forces (IDF) and even some Zionists with whom she disagreed.

52.    To keep the discussions and comments on her social media about the Gaza conflict respectful and avoid any violations of Chartwell Law's social media policies, Plaintiff avoided any negative references to Jews or Judaism on her social media.   She also made it clear that her criticism of the "other side" was directed towards Israel's government, the IDF and the Zionists who continued to push for a military solution that targeted innocent Palestinians even as public opinion in Israel started turn against the war.

16

53.     Although there was no content about politics, religion or armed conflict on Plaintiff's Instagram page prior to the Gaza conflict, her social media presence was no secret to many of her co-workers who enjoyed her content about being a mom and a lawyer.   Her social media pages and postings were routinely "liked" and commented on by her co-workers, and she was even "followed" by several of the Firm's partners and associates.  These positive reactions from her co-workers continued even when Plaintiff began to use her social media platforms to speak about the Gaza conflict after October 7, 2023.

54.     No employees or clients of Chartwell Law ever complained to Plaintiff about any of her social media posts in 2023 regarding the Gaza conflict, but since her pages were accessible by the public, some of her pro-Palestinian social media posts drew negative and sometimes threatening reactions and comments from supporters of Israel and self-proclaimed Zionists. Despite Ms. Khorashi's efforts to politely and respectfully engage some of these individuals as best she could in a non-threatening manner, there were several individuals who began to regularly "troll" her social media posts with vile comments about the Muslim religion and even personal threats towards Plaintiff and her family for opposing the actions of the IDF.

55.     Toward the end of November of 2023 and early December of 2023, Ms. Khorashi noticed that an Instagram profile with the handle "Beth Margot" was consistently attacking and criticizing nearly every one of her posts about Gaza.  Over time, the trolling from "Beth Margot" became increasingly obsessive,

vile and hateful, and Plaintiff finally blocked her after she posted a threatening comment that Ms. Khorashi did not deserve to be a mother or an attorney due to her support of the Palestinians and her opposition to the actions of IDF and the Zionists.

56.     Plaintiff soon learned that Beth Margot was a pseudonym for Beth Gellman Beer, the wife of Chartwell's former CEO, Gadi Beer, who resigned from Chartwell in January of 2023 but still holds equity in the Firm and maintains close relations with some of the Firm's equity partners.

57.     In December of 2023, the Uber Team at Chartwell Law started to set up case handling meetings to begin the process of transferring certain Uber files from the Atlanta office to partners on the Firm's Florida offices beginning in January 2024.   Ms. Khorashi attended every one of the required planning meetings with the rest of the Uber Team but when the first files were transferred to Chartwell's Florida offices in late December 2023, she noticed that she was not being assigned any work on the files as an associate.   Plaintiff reached out to Mr. Burrell via text messages and email to ask why she was not given any work after their prior discussions and her participation in the recent Uber Team meetings, but unlike a few months earlier, Mr. Burrell failed to respond to any of her communications and never contacted her again about working on the Uber files.

58.     January 4, 2024, Ms. Khorashi emailed Jenn Majewski in HR to ask why Chartwell Law failed to publicly acknowledge any Muslim holidays and

whether the Firm would consider honoring significant Muslim holidays on its social media pages in 2024 in addition to the other religious and non-religious holidays it already acknowledged.  If Ms. Majewski needed any additional information to support the request, Plaintiff offered to share her own knowledge and experience as a Muslim and answer any questions that she or other members of the Firm had about Muslim holidays.

59.    In her response, Ms. Majewski advised Plaintiff that the Firm had already updated their 2024 calendar to acknowledge the Muslim holidays and that a Teams call would be scheduled with her to further discuss the issues she had raised.

60.    When Ms. Khorashi signed in to the scheduled Teams call on January 11, 2024, she saw that Ms. Majewski had been joined by Chartwell founding partners Tom Strometz and Chuck Barreras, as well as Michelle Greenberg, the Firm's new General Counsel who had been hired in September 2023.

61.    Instead of discussing Muslim holidays, as Ms. Khorashi anticipated, Mr. Barreras blindsided her and stated that the purpose of the call was to discuss Plaintiff's social media posts regarding the Gaza conflict after certain unidentified individuals had expressed "concerns" about her posts discussing the escalating number of Palestinian civilian deaths in Gaza.

62.    Mr. Barreras specifically mentioned a social media post on January 8, 2024, Plaintiff reported that more than 30,000 innocent Palestinian civilians

had been killed by the IDF in the three months since the Gaza conflict erupted, including almost 13,000 children, and referred to Israel's actions as "the ethnic cleansing and genocide of the Palestinian people."

63.    Based on the anonymous complaints he claimed to have received, Mr. Barreras advised Ms. Khorashi that the Firm had been more closely monitoring her social media content since the outbreak of the Gaza conflict to ensure that her posts and comments did not offend any particular group of people.  Mr. Barreras then showed Ms. Khorashi two of her nearly 70 posts about the Gaza conflict that he felt could be construed as offensive to "some people." Plaintiff disputed this characterization and denied that her posts were intended to offend anyone and were created in response to seeing the violence and abuse inflicted on the Palestinian people in Gaza.  Nevertheless, to resolve the issue and hopefully move on from it, she agreed that in hindsight some of her personal comments were written when she was in an emotional state and one post included some profanity that did not reflect her own personal values or what she stood for.

64.    At no time during the meeting did Mr. Barreras or anyone else ask Ms. Khorashi to remove the two posts in question or to stop posting about Gaza on her social media going forward, nor was she advised to remove or even consider removing any of the other posts on her Instagram page. Most importantly, she was never accused of being antisemitic or advised that the Firm considered any of her social media posts to be antisemitic.  Instead, Mr. Barreras

20

simply advised her to be "mindful" of her social media posts going forward and to try to be more "positive" so that they did not disparage others and aligned with the Firm's values of inclusivity and diversity.

65.     Plaintiff emailed Mr. Barreras and Mr. Strohmetz after the meeting to thank them for taking the time to speak with her about their concerns and to reaffirm her own personal commitment to the Firm's values.  After reiterating her continued support for the Palestinians in Gaza, she offered to remove some of the emotionally charged wording from her captions on the posts, but the posts themselves were never removed.

66.     Approximately a week after this meeting, on or about January 19, 2024, Ms. Majewski scheduled another Teams call with Ms. Khorashi and Michelle Greenberg.  During this meeting, Ms. Greenberg showed Plaintiff a new post that appeared on her Instagram page on January 18, 2024 and claimed it could be construed as inciting hatred or violence towards "certain groups of people" who were "on the other side."  Although she was careful not to use any religious terms when expressing her concerns about the "people on the other side" it was obvious from the context of the conversation that Ms. Greenberg was referring to Jewish people who might be offended by her support of the Palestinian cause in Gaza.

67.     The post in question noted that in 104 days, more than 24,000 Palestinians had been killed in Gaza, with 1.9 million displaced from their homes.  The casualty figures were followed by a quote from Thomas Jefferson

that "when tyranny becomes law, rebellion becomes a duty," to which Plaintiff added her own comment that "the time for a revolution is now." Apart from condemning the rising death toll among Palestinian civilians, the post made no reference to Israel or the Jewish religion.

68.    Ms. Khorashi politely and respectfully disagreed with Ms. Greenberg's conclusion that the post could reasonably be construed as offensive or critical of "the other side." She also pointed out to Ms. Greenberg that the Firm's social media policy did not limit or restrict the content of private comments on social media so long as the view and opinions expressed are not inappropriate or harmful to Chartwell Law, its employees, or clients.

69.    Because none of her posts violated Chartwell Law's social media policy or even mentioned the Jewish religion, Plaintiff asked Ms. Greenberg why a Pakistani Muslim woman like herself was being singled out for criticism and corrective action for her social media posts about the Palestinian deaths in the Gaza conflict, when she was personally aware of social media posts and content from other Firm employees that supported the position of Israel and the IDF in Gaza. As in the January 11 meeting, no one advised Plaintiff that her social media activity or any of her posts violated the Firm's social media policy and she did not agree to any self-censorship going forward.

70.    After responding to the unwarranted criticism of her January 18, 2024 post and pointing out the discriminatory double standard that she felt was being applied to her social media activity regarding the Gaza conflict, Ms.

Khorashi told Ms. Greenberg that out of respect for the Firm she would remove the post. In a follow-up email the next day, she advised Ms. Greenberg that even though she agreed to remove the post, she would be reluctant to engage in such self-censorship again since she was being treated differently than others. At no time during the meeting or afterwards was Ms. Khorashi advised by Ms. Greenberg or anyone else that her social media activity violated the Firm's policies or that she should stop posting on her social media about the Gaza conflict.

71.     Over the course of the next several weeks, Plaintiff posted 33 times on her Instagram page about the Gaza conflict and her opposition to what she described as a genocide against the Palestinian people.

72.     On January 21, 2024, just three days after her meeting with Michelle Greenberg, Ms. Khorashi posted a comment about people trying to silence her opinions about the Gaza conflict and promised to "speak louder" and stand firm in her beliefs because "Muslim women do not falter. We Prevail." In other posts, Plaintiff pushed back against the notion that being "Pro-Palestine" and opposing the rising civilian casualties and other atrocities by the IDF in Gaza made her or anyone antisemitic.

73.     On January 29, 2024, Plaintiff posted comments calling on Hamas to release the remaining Israeli hostages and agree to a permanent ceasefire so that aid shipments to Gaza could resume, and in a post dated February 7, 2024, she offered the following quote from Malcolm X: "If you're not careful, the

newspaper will have you hating the people who are being oppressed and loving the people who are doing the oppressing." On February 15, 2024, she posted a warning about the weaponization of people "who repeatedly dox, attack and threaten [the] livelihood" of those who use their "power and influence" to speak out in favor of the Palestinian cause in Gaza.

74. Doxing is a type of cyber-harassment which involves the online public release of personal information that can be used to identify or locate an individual, usually without the individual's consent. A doxing attack generally involves gathering private or identifying information about an individual or group and then publishing it publicly to facilitate harassment or ruin their reputation. Once the information is made public, other users use it to target the individual. This can lead to various forms of harassment, including, but not limited to: threats, abusive emails, calls, and texts; attacks on their place of work; "swatting," where authorities are anonymously called to a victim's address based on false claims (e.g., hostage situation, bomb threat); criminal cyberstalking and even real-life harassment and violence.

75. Ironically, within three days of her warning to others about doxing attacks by supporters of Israel, on February 18, 2024, Ms. Khorashi herself was "doxed" on an Instagram page called Jew Hate Database ("Jewhatedb") which is operated by the organization Stopantsemitism.org and is administered by an individual with the handle "Stellaingerescobedo" who follows and is followed by the page "Stopantisemitism.org." To falsely portray Plaintiff as antisemitic,

Jewhatedb claimed to have "fixed" a post from her Instagram page condemning the perpetrators of violence against Gaza by crossing out and replacing the pronoun "they" with the word "Jews." A copy of the initial doxing post from the Jewhatedb page is attached as Exhibit 2 and incorporated by reference herein.

76.     Although the image posted on Jewhatedb did not include Plaintiff's name or any reference to her employment at Chartwell Law, it predictably generated dozens of hateful and threatening comments about Ms. Khorashi, as well as speculation about where she worked and demands that she be fired by whatever Law Firm employed her.    Although Chartwell Law had previously reviewed the post that was submitted to Jewhatedb to dox Plaintiff, it found no issues with the content.

77.     The Jewhatedb Instagram page boasts 137,000 followers and is a project that exists for the purpose of "[e]xposing the faces of Jew hatred," and it publicly proclaims that "[w]e've got all the receipts" in addition to encouraging its followers to "[s]ubmit Jew hatred incidents via link."   The dashboard for Jewhatedb includes links to other pages on the site such as "Exposed" where followers can see a gallery of hundreds of posts "outing" Muslims and other supporters of Palestine, labelling them as  vicious and dangerous antisemites, calling for them to be harassed online and in person and, in most cases, demanding that they be summarily fired from their employment without any due process or opportunity to defend themselves.    There is also a "Do You Recognize?" tab where people can provide contact information for the targeted

individuals and their employers, which is then served up to the 137,000 followers of Jewhatedb in order to mobilize a temporary lynch mob that is anonymous, highly motivated and which can collectively cause far more damage to the target and with a much better chance of success than one or two individuals acting on their own. It also provides the added benefit of deniability since the individual who submits the victim for doxing does not even have to participate in the doxing attack themselves.

78. In virtually all cases, the stated goal of the doxing attacks initiated and launched from Jewhatedb is to publicly damage a person's personal and professional reputation to such an extent that the negative backlash to their employer's business "forces" the employer to publicly fire them and makes them "radioactive" to any future employers. To tout its success rate, Jewhatedb has an "Updates" section where followers can view hundreds of posts confirming the significant harm suffered by the targeted individuals because of the doxing. In addition, there are numerous examples of collaboration between Jewhatedb, "Stellaingerescobedo" and StopAntisemitism.org where an individual like Plaintiff who is first targeted for doxing on Jewhatedb is subsequently "exposed" on StopAntisemitism.org's X page.

79. Upon information and belief, Chartwell Law's former CEO Gadi Beer and his wife Beth Beer conspired to submit Plaintiff's Instagram post to the Jewhatedb Instagram page and had advance notice that Ms. Khorashi was going to be "exposed" as an alleged antisemite and Jew hater on February 18, 2024.

26

Their simultaneous appearances in the comments section of Jewhatedb immediately following the posting was for the purpose of providing the critical missing information that was required to launch the doxing attack: Plaintiff's real name and a link to her Firm profile at Chartwell Law.  Timing was critical and although there was a possibility that the commenters calling for Plaintiff's termination would eventually discover the information themselves, the Beers were able to capitalize on their personal knowledge of Plaintiff and Chartwell Law and immediately provide the link to the Firm website at a point in time where it would be most effective in priming the attack by commenters who were ready to mobilize now.

80.   The first commenter to call for Ms. Khorashi's termination on Jewhatedb was an individual with the profile "gramm_tamm" who suggested that they should "find out who this person is and have her fired . . . she's a lawyer, should be easy to find her."  This comment dew a quick response from Beth Beer who concealed her identity by using her fake screenname "Beth Margot" to disclose that "she works at Chartwell Law Offices" while providing a link to Plaintiff's Chartwell Law profile which included her work email, phone number and the contact information for Chartwell's office in Miami.

81.   To further motivate the commenters on Jewhatedb who expressed interest in contacting Chartwell Law to demand Plaintiff termination, Beth Beer made an additional inflammatory statement based on non-public and highly confidential information about Plaintiff's and the Firm's clients that only she and

her husband possessed: "I wonder how her Jewish clients would feel about her public posts. This one is innocuous compared to her regular posts. It's disgraceful." After a commenter identified as "billssunshine" exclaimed that he "Found her in a second" with the link and that "[s]he's horrible," Gadi Beer reposted the same link to Chartwell Law that "Beth Margot" had posted.

82.     The sequence here -- requests for employer information, disclosure, amplification by others, doxing on a larger social media platform, and, ultimately, termination -- is consistent with the well-recognized chain reaction of harassment campaigns. Once Plaintiff's employer name, website link, and workplace location was posted on Jewhatedb in a thread explicitly encouraging her firing, it was reasonably foreseeable that larger actors would amplify the post, that Plaintiff would be doxed, and that Chartwell Law would face pressure to terminate her.

83.     When Plaintiff was informed by some of her friends that she had been doxed on the Jewhatedb Instagram page, she tried to access the page only to find that she had already been pre-emptively blocked from commenting on the doxxing post that falsely accused her of antisemitism. Based on the screenshots that were sent to her by others, she was able to see that Gadi Beer and "Beth Margot," the individual that had been "trolling" her on her Instagram page almost incessantly since November 2023 had each responded to the calls to fire her by posting a link to her profile and contact information on the Chartwell Law website.

84. After looking closely at Gadi Beer's public profile on Facebook, Ms. Khorashi was able to verify that "Beth Margot" was a pseudonym used by Mr. Beer's wife, Beth Gellman Beer, who, in February 2024, was employed as a Regional Director at U.S. Department of Education Office for Civil Rights. After trolling Plaintiff under the fake name "Beth Margot" for almost four months, it appeared that Ms. Beer and her husband were now actively working together and with other online trolls to have her terminated from her employment with Defendant because she was a Pakistani Muslim woman who opposed what she and many others deemed the "genocide" of Palestinians in Gaza by the IDF and the Israeli government.

85. On February 28, 2025, just ten days after Gadi and Beth Beer posted a link to Plaintiff's Chartwell Law profile and contact information on the "Jewhatedb" Instagram page in response to calls for her termination, Ms. Khorashi's picture and her professional/personal information appeared on a public X (formerly known as Twitter) account known as "StopAntisemitism.org."

86. Like to the affiliated Jewhatedb Instagram account which it operates, StopAntisemitism.org has a well-known history of doxing, harassing and intimidating Pro-Palestinian advocates on social media, the vast majority of whom are Muslims. In addition, there are numerous examples of where a doxing collaboration between Jewhatedb and "Stellaingerescobedo" is then duplicated on StopAntisemitism.org's social media platforms to boost the exposure and synergistic effect of the initial doxing.

87.     A typical doxing campaign by StopAntisemitism.org involves posting the target's professional and personal information on its page and specifically encouraging its large base of followers to harass the individual.  The resulting harassment varies depending on the target and the goal of the doxxing attack, but can typically include reposting the false and malicious accusations to other pages to make them go "viral" and increase the negative exposure, trolling the target directly with threating "comments" on their social media pages and posts, contacting the individual's employer to accuse them of employing a known antisemite and demand their immediate termination.  In some particularly egregious cases, followers of stopantisemitism.org have physically stalked the accused person or even showed up announced at their home to threaten them or commit acts of violence.

88.     In a profile posted on the Jewish News Service on October 22, 2025, https://www.jns.org/stopantisemitism-out-of-1000-antisemites-profiled-400-have-been-fired/, Liora Rez, the founder and executive director of StopAntisemitism publicly confirmed that of the more than 1,000 alleged "grotesque antisemites" that have been exposed and targeted by the organization's "name-and-shame social media posts" since October 7, 2023, more than 400 of them have been fired.   Ms. Rez further described how StopAntisemitism typically notifies employers before a post about one of their employees is about to go live, to warn them of the serious "legal liability" that

she believes can arise from bringing such "hateful views" into the office and how it can "create a climate of harassment or unsafe conditions" for others.

89.     According to Ms. Rez, It is only where an employer ignores the warning or is slow to act that StopAntisemitism "put[s] out a public call to action campaign."  Once the public is involved "that's when we see the needle move more because they don't want to look like they dropped the ball or they ignore a case of antisemitism."

90.     Plaintiff's name and personal information were posted by the StopAntisemitism.org account on February 28, 2024 at approximately 2:29 p.m. The doxing attack highlighted two social media posts from Plaintiff's Instagram and attributed them to Ms. Khorashi, even though one of them was a post written by someone else that she simply "liked" without further comment.  Similar to the doxing attack on Jewhatedb ten days earlier, commentary was added to both posts to amplify the false narrative that Plaintiff was a virulent antisemite and supporter of terrorism by Hamas. The doxing post on StopAntisemitism.org also included a comment similar to Beth Beer's question on JewhateDB about how Plaintiff's "Jewish clients" would feel if they were aware of her alleged antisemitism.  Copies of the doxing posts from the StopAntisemitism.org page are attached as Exhibit 3 and incorporated by reference herein.

91.     Chartwell Law was already well-aware of the social media posts that were highlighted in the doxing attack by StopAntisemitism.org since it had reviewed all of Plaintiff's posts since October 7, 2023 and met with her twice in

January 2024 to reiterate the Firm's social media policy and advise her that her social media posts would be monitored by the Firm going forward.  Although Defendant asked Plaintiff to be mindful of the policy and the Firm's values when posting on her private social media about the Gaza conflict, prior to the doxing attack on February 28, 2024, Plaintiff was never advised that any of her posts violated Chartwell Law's social media policy or could subject her to potential disciplinary action, let alone termination.

92.    Within just a few minutes of the posts, Ms. Khorashi received dozens of harassing messages on her social media accounts, threatening phone calls and emails containing anti-Muslim rhetoric and graphic threats of violence against her and her family.  While some of these threats came from anonymous internet "trolls," other hateful comments were openly posted by licensed Jewish attorneys under the real names.  For example, Matthew H. Friedman, Esq., Founding Partner of Ford & Friedman in Henderson, Nevada, wrote the following on February 29, 2024 at 8:06 a.m.:  "Good luck getting a job in a law office again you jew hating cunt."

93.    In addition to the harassing messages and emails received by Ms. Khorashi in the hours immediately the doxing on February 28, 2024, Chartwell Law claimed that it, too, began to receive an overwhelming number of phone calls, voicemails, emails and social media messages from supporters of Israel expressing anger, dismay, offense and disgust at Plaintiff's social media posts

about the Gaza conflict, and demanding that Chartwell Law fire her immediately for her alleged antisemitic words and opinions.

94.    The following morning, on February 29, 2024 at approximately 10:20 am, Chuck Barrares, Michelle Greenberg, and Jenn Majewski called Plaintiff to inform her that she was being summarily terminated from her employment with Defendant, effective immediately, because her social media content did not "align with the Firm's values and beliefs" and her postings made its Jewish employees feel unsafe.

95.    When Ms. Khorashi attempted to bring to Mr. Barreras' attention that several other employees, including Michelle Greenberg, had either engaged with or posted political content that was pro-Israel and extremely offensive to Muslims and Arabs, Mr. Barreras abruptly cut her off telling her "I do not want to hear it. You are terminated."  He also showed little concern for Plaintiff's wellbeing or personal safety as she described some of the vicious and hateful comments that were made about her on social media in connection with the doxing, which included credible threats to harm or even kill her and her family. Plaintiff was particularly concerned that within a few hours of being doxed, several unknown "visitors" had approached the security guard at her gated community to ask if she lived there before they were turned away, and she speculated that her new home address may have been improperly disclosed by members of the Firm since it was not publicly known or even listed on her driver's license yet.

96.     Despite Defendant's claims that her social media posts made the Firm's Jewish employees feel unsafe, Mr. Barreras seemed uninterested in Plaintiff's serious concerns about the online threats that she had received or the potential for violence against herself or her family.  To Ms. Khorashi's knowledge, Defendant took no action to report the alleged threats to the appropriate law enforcement agency or otherwise ensure the safety of herself or the Jewish employees who allegedly claimed to feel threatened.

97.     Plaintiff termination was unrelated to her job performance, since throughout her employment and at the time of her termination, Ms. Khorashi was able to perform the essential functions of her job duties and responsibilities as an associate attorney at a level of proficiency that was equal to or greater than other associate attorneys with similar years of experience and which met the Firm's expectations for full-time associate attorneys.

98.     In its Position Statement filed in response to Plaintiff's EEOC Charge, Defendant referred to the doxing attack launched from the StopAntisemitism.org X account on February 28, 2024 as the "climactic triggering event" that resulted in the decision to terminate Plaintiff's employment with Chartwell Law.

99.     Upon information and belief, Defendant's senior management had advance notice of the doxing attack on Plaintiff, from either Gadi Beer, Beth Beer or one or more individuals from the StopAntisemitism.org project, which, by its ownership and/or affiliation with the social media pages for Jewhatedb and

StopAntisemitism.org, effectively controlled the content and timing of the "name-and-shame social media posts" about Plaintiff on Jewhatedb and StopAntisemitim.org.

100.  On March 1, 2024, Plaintiff sent the following email to Chartwell Law equity partner Chuck Barreras and Jennifer Majewski regarding her termination:

> Please allow this email to serve as a follow-up to our conversation yesterday regarding my termination. It is my understanding that Chartwell decided to terminate me as a result of the anti-genocide content that I post on my personal social media page. I was advised by Chuck Barreras that my content does not coincide with the firm's values and beliefs. Yesterday, for the first time since I started posting my content in support of Palestine, I was told that my content made the firm's employees feel unsafe, tellingly without any context or specifics.

> As you know, the content at issue here is publicly viewable, advocates for Palestinians, and shares content published and spoken by Israeli officials as well as IDF soldiers, focusing on an end to the genocide in Gaza. I have been posting content in support of Palestine since late October of 2023. Multiple Chartwell employees follow my social media page, including partners, equity partners, and associates.

> The timing of our conversation makes it clear that "employees feeling unsafe" is a pretext for my termination. This pretext was created to obscure the firm's decision to carry out the objectives of the account "@stopantisemitism" on X. As you know, this account defamed and slandered me by misappropriating and misrepresenting my content on their page in order to fit to fit their racist intentions in an attempt to incite hate against me and my family and the loss of my job.

> Unfortunately, given the firm's decision to terminate me less than 24 hours after the @stopantisemitism post, the firm carried out the site's mission without hesitation. It is well-known that the account "@stopantisemitism" is designed to systematically incite hate, dox, bully, harass, and use professional intimidation to silence and suppress those who share a different opinion than theirs.

It is a deeply concerning that Chartwell by terminating my employment is demonstrating support for the slanderous post about me on the @stopantisemitism page, a page filled with racist and Islamophobic rhetoric with the sole mission to incite hate against the Muslim community and those in support of the Muslim and Arab community.

One look at the post defaming and slandering me on the @stopantisemitism page makes it abundantly dear that the post received more support on my behalf and criticism regarding how my posts are not antisemitic. At a minimum, the conversation yesterday should have been about how the firm could support me, one of the only female Muslim attorneys at the firm, in the wake of being targeted with blatant defamation and slander by a public site.

It is an absolute shame and a disgrace that this is the way Chartwell chooses to treat an attorney who has been with the firm for 6 years. It is clear there is no room for growth or a home for minority attorneys, especially those who are Muslim. I want to reiterate some points of discussion from yesterday regarding concerns I raised with respect to the firm's general counsel, safety of my family and myself.

First, I noted that the general counsel has liked and supported islamaphobic content on professional sites like LinkedIn, making it clear that she supports the termination and expulsion of any supporters of Palestine. See Attached posts. Given my swift termination after the X post by @antisemitism, it is clear that the general counsel has inserted her own political beliefs into the representation of the firm. Someone acting with such bias is unable to provide impartial and wise counsel to a firm that claims to be diverse and inclusive of all with different faith, backgrounds and beliefs.

Again, tellingly, my content was never an issue or brought to the firm's attention prior to the general counsel joining the firm two months ago. Do Chartwell diverse employees feel safe having a firm counsel who likes content calling Palestinian students "shitheads"? Do Chartwell diverse employees feel safe when its owners, under the guidance of the current firm counsel, provides celebratory ammunition and inspiration to the very people posting the vile comments on my social media about my family? To the very people threatening me and my family with violence? Second, since @stopantisemtitism post the firm's decision to terminate me, somehow my new home address, which only has been updated with the firm, has been doxed. Even my license has not yet been updated with a new address. In that time, I have received several death threats with people threatening to show up at my house and do harm to me and my family. I have legitimate

concerns whether someone at Chartwell may be responsible for my current address being doxed, placing me and my family in danger.

Further, it is evident that Chartwell's action does not align with the firm's stated values on diversity, equity and inclusion. Chartwell has systematically practiced the exclusion of the Muslim community by failing to acknowledge its holidays or occasions as it does with other faiths and communities. Chartwell has failed to acknowledge and properly address complaints raised by me and the few other Muslim attorneys within the firm against white attorneys.

It appears Chartwell systematically addresses HR complaints made by Muslim/Arab and POC attorneys against white attorneys through the process of constructive termination: reducing one's case load so they are unable to meet hour requirements; pushing them to be part-time employees due to them not meeting their hour requirements; eventual termination for failure to bill sufficient hours. However, unlike other attorneys, I refuse to be bullied or silently forced out from Chartwell when I have done nothing wrong.

At this time, I am requesting a formalized termination letter from the firm. Further, I was not able to complete billing on my February time yesterday as the firm restricted my access to ATO without notice or warning at 11 am. This billing needs to be completed. Please send over the termination letter and instructions on how and where to bill my time, so that I can receive my final paycheck, at your earliest convenience.

A copy of Plaintiff's March 1, 2024 email is attached hereto as Exhibit 4, including the images of the referenced anti-Palestinian and anti-Muslim social media posts by Michelle Greenberg.

101. Ms. Greenberg's social media posts about the Gaza conflict included an article referencing pro-Palestinian students as "sh*t for brains," and a disturbing post by Gary Botwinick, calling a racially and religiously inclusive statement by the American Bar Association (ABA) "horrible" because in addition to condemning antisemitism, it also condemned anti-Palestinian racism and Islamophobia. As part of its criticism of the ABA's statement, the Gary Botwinick

post liked by Ms. Greenberg also referenced the attacks on September 11, 2001 and implied that all Muslims and Palestinians were terrorists.   Ms. Greenberg also has also "celebrated" and "liked" numerous posts on her professional LinkedIn page that are openly hostile towards Muslims who support the Palestinian cause.

102.   Despite expressing her own serious concerns to Mr. Barreras about her personal safety because of the way she doxed and terminated by Chartwell Law and providing copies of Michelle Greenberg's social media posts that referenced in her email, Defendant never responded to Plaintiff's post-termination email.

103.   Within a week of Plaintiff's termination, Chartwell Law partner Mehdi Mansuer resigned his position with the Firm after publicly stating his strong disagreement with the Firm's decision to terminate Ms. Khorashi based on complaints from a "libelous but popular Twitter account" after she "rightly used her large social media reach to advocate for Palestinian rights."

104.   By the time Mr. Mansuer resigned, Defendant had also disabled the comments feature on its social media pages due to the overwhelming number of comments it was starting to receive in support of Plaintiff and condemning the decision to fire her due to her support of the Palestinians in Gaza.

105.   The comments feature on Chartwell Law's social media pages on both X and Instagram remained disabled for a few weeks after Plaintiff's termination.   When the Firm reactivated the comment feature and posted about

St. Patrick's day on March 17, 2024, the first and only comment on the post was a statement of support for Plaintiff was critical of Chartwell's decision to fire her.

106. On or about March 21, 2024, just three weeks after Plaintiff's termination, Michelle Greenberg herself became the subject of a viral post on Instagram regarding her social media posts on LinkedIn expressing her anti-Muslim views on the Gaza conflict. These were the same posts that Ms. Khorashi had provided to Defendant with her email the day after her termination.

107. Based on the anti-Muslim and anti-Palestinian content that Ms. Greenberg was sharing, liking and celebrating, her social media profile also ended up being featured on "StopArabHate.org," a grassroots organization that was formed to combat Arab hate and Islamophobia in the news media and on social media. After being exposed by StopArabHate.org, Ms. Greenberg's posts were shared across several other influential Instagram accounts including Grassrootslaw.org, an educational and advocacy organization founded and supported by Shaun King and the Black Lives Movement, and which has nearly one million followers.

108. Like the public reaction to Plaintiff's posts a few weeks earlier, the overwhelming negative response from Michelle Greenberg's anti-Muslim posts being shared across numerous high profile Instagram account resulted in Chartwell Law receiving dozens of calls, emails, and comments on its Instagram page. Although The comments from people who opposed Ms. Greenberg's posts and Plaintiff's firing were, on the whole, far more respectful than the vile, hateful

and threatening comments about Ms. Khorashi from the other side,  the negative reactions to Ms. Greenberg's social media posts caused Defendant to deactivate its Instagram account for more than three months, from March 21, 2024 until July 4, 2024, and Chartwell did not post anything on its X account for more than a year.

109.   In addition to Michelle Greenberg, Chartwell Law's founding partner Andrew E. Greenberg (no relation) used his social media account on X to post dozens of deeply offensive, inflammatory and divisive comments, memes and images that violated Chartwell Law's social media policy and were inconsistent with its stated values of diversity, respect for others and inclusivity.  Instead of commenting on Gaza, however, Mr. Greenberg used his social media platform to viciously attack then-Presidential candidate Donald Trump during the months preceding his election in November 2024, while openly identifying himself as former Republican and a founding member of the Firm.

110.   Mr. Greenberg's vitriolic and hateful social media posts about Donald Trump included a meme on July 1, 2024 that depicted President Biden asking Seal Team 6 if he could "Take [Trump] out."  This was less than two weeks before the attempted assassination of Mr. Trump on July 13, 2024.  A meme posted on July 7, 2024 depicted Mr. Trump as the Biblical Golden calf being worshipped by his followers who shout "Fake news" at a figure depicting Moses as he accuses Trump of violating several of the Ten Commandments.  On July 23, 2024, Mr. Greenberg attacked Mr. Trump's supporters with a meme stating

that "when you're loyalty to a felon is greater than your love for your country, you are the problem." On August 23, 2024, he posted a picture of Mr. Trump with a red hat that says "Fucking Moron" instead of MAGA, and a post on September 9, 2024 included a crude sexual reference encouraging women married to MAGA men to vote for Kamala Harris and then lie to their husbands that they voted for Trump because "chances are it's not the first thing you've had to fake."

111.  Mr. Greenberg additionally posted several memes on his X account comparing Mr. Trump to Adolf Hitler. A meme from August 12, 2024 shows a figure that purports to be JD Vance apologizing for calling Mr. Trump "America's Hitler" before he expresses relief that Mr. Trump took it as a compliment. On at least two other occasions, Mr. Greenberg posted a meme titled "Not a Shadow of a Doubt," which showed Donald Trump and Kamala Harris speaking from podiums, with shadows of Adolf Hitler behind Mr. Trump and the Statue of Liberty behind Ms. Harris. On October 18, 2024, Mr. Greenberg reposted an article from Atlantic Magazine accusing Mr. Trump of "speaking like Hitler, Stalin and Mussolini," and on multiple occasions, he posted a meme with a quote from Mr. Trump that "I'm not Hitler."    He also accused Mr. Trump on social media of being a mass murderer due to his ineffective response to the COVID pandemic.

112.  Defendant's failure to take any corrective or disciplinary action against Michelle Greenberg or Andrew Greenberg for their undeniable and indefensible violations of the Firm's social media policy supports the conclusion

that the alleged legitimate reasons proffered by Defendant for Plaintiff's termination were a pretext for unlawful discrimination based on her Pakistani race/national origin, her Muslim religion and her continuing complaints of unlawful discrimination after they led to her demotion to  a part-time hourly position with no benefits.

## COUNT I

### 42 U.S.C. § 1981 Discrimination Claim (Race/National Origin)

113.   Plaintiff realleges Paragraphs 1 through 8 and 13 to 112 as if fully set forth herein.

114.   Section 1981 was originally enacted as § 1 of the 1866 Civil Rights Act and provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  The rights conferred under 42 U.S.C. § 1981 include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship and are protected against impairment by nongovernmental discrimination.

115.   Defendant has violated 42 U.S.C. § 1981 by subjecting Plaintiff to discrimination based on her race and national origin, including demoting Plaintiff to part-time status and ultimately terminating her employment.

116.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 42 U.S.C. § 1981, Plaintiff has suffered

and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

117.    Defendant's discrimination under 42 U.S.C. § 1981 has caused Plaintiff to suffer and continue to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

118.    Defendant's discrimination constitutes a willful and wanton violation of 42 U.S.C. § 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Ms. Khorashi to an award of punitive damages.

WHEREFORE, Plaintiff Zohra Khorashi prays that this Court will:

A.    Declare that the actions of the Defendant constituted unlawful discrimination under 42 U.S.C. § 1981;

B.    Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under 42 U.S.C. § 1981;

C.    Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, emotional distress and damage to her professional reputation and career, in such amount as will reasonably compensate her for her losses;

43

D.      Award Plaintiff punitive damages;

E.      Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action;

F.      Grant Plaintiff such other and further relief as the Court deems equitable, just and proper.

## COUNT II

### 42 U.S.C. § 1981 Retaliation Claim

119.   Plaintiff realleges Paragraphs 1 through 8 and 13 to 112 as if fully set forth herein.

120.   Defendant has violated 42 U.S.C. § 1981 by subjecting Plaintiff to retaliation based on her complaints and opposition to Defendant's unlawful and discriminatory employment practices, including demoting Plaintiff to part-time status and ultimately terminating her employment.

121.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of 42 U.S.C. § 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

122.   Defendant's retaliation under 42 U.S.C. § 1981 has caused Plaintiff to suffer and continue to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and

suffering for which she is entitled to an award of monetary damages and other relief.

123.   Defendant's retaliation constitutes a willful and wanton violation of 42 U.S.C. § 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, thereby entitling Khorashi to an award of punitive damages.

WHEREFORE, Plaintiff Zohra Khorashi prays that this Court will:

A.    Declare that the actions of the Defendant constitute unlawful retaliation prohibited by 42 U.S.C. § 1981;

B.    Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under 42 U.S.C. § 1981;

C.    Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, pain, suffering, emotional distress, and damage to her professional reputation and career, in such amount as will reasonably compensate her for her losses;

D.    Award Plaintiff punitive damages;

E.    Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action;

F.    Grant Plaintiff such other and further relief as the Court deems equitable, just and proper.

## COUNT III

### FCRA National Origin Discrimination Claim

124. Plaintiff realleges Paragraphs 1 through 112 as if fully set forth herein

125. The conduct of Defendant more particularly alleged above constitutes a violation of the Florida Civil Rights Act of 1992, § 760.10(1)(a), Fla. Stat., which makes it an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's national origin.

126. By engaging in the conduct described herein, Defendant subjected Plaintiff Khorashi to discrimination and ultimately terminated her employment because of her national origin (Pakistan), in violation of the FCRA.

127. As a result of Defendant's unlawful conduct in violation of FCRA, Plaintiff has suffered compensatory damages, including, but not limited to, loss of pay and benefits and other intangible injuries.

128. The conduct of Defendant was willful and wanton, and in such reckless disregard of Plaintiff's rights under FCRA, that Khorashi should additionally be awarded punitive damages.

WHEREFORE, Plaintiff Zohra Khorashi prays this court will:

A.      Declare that the actions of the Defendant constitute unlawful discrimination prohibited by the FCRA

B.      Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under the FCRA;

C.      Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, pain, suffering and emotional distress and damage to her professional reputation and career, in such amount as will reasonably compensate her for her losses;

D.      Award Plaintiff punitive damages;

E.      Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action pursuant to § 760.11, Fla. Stat.;

F.      Grant Plaintiff such other and further relief as the Court deems equitable, just and proper.

## COUNT IV

### FCRA Religious Discrimination Claim

129. Plaintiff realleges Paragraphs 1 through 112 as if fully set forth herein.

130. The conduct of Defendant more particularly alleged above constitutes a violation of the Florida Civil Rights Act of 1992, § 760.10(1)(a), Fla. Stat., which makes it an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's religion.

131.   By engaging in the conduct described herein, Defendant subjected Plaintiff Khorashi to discrimination and ultimately terminated her employment because of her religion (Muslim), in violation of the FCRA.

132.   As a result of Defendant's unlawful conduct in violation of FCRA, Plaintiff has suffered compensatory damages, including, but not limited to, loss of pay and benefits and other intangible injuries.

133.   The conduct of Defendant was willful and wanton, and in such reckless disregard of Plaintiff's rights under FCRA, that Khorashi should additionally be awarded punitive damages.

WHEREFORE, Plaintiff Zohra Khorashi prays this court will:

A.   Declare that the actions of the Defendant constitute unlawful discrimination prohibited by the FCRA

B.   Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under the FCRA;

C.   Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, pain, suffering and emotional distress and damage to her professional reputation and career, in such amount as will reasonably compensate her for her losses;

D.   Award Plaintiff punitive damages;

E.   Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action pursuant to § 760.11, Fla. Stat.;

F.   Grant Plaintiff such other and further relief as the Court deems

equitable, just and proper.

## COUNT V

### FCRA Retaliation Claim

134. Plaintiff realleges Paragraphs 1 through 112 as if fully set forth herein.

135. The conduct of Defendant more particularly alleged above constitutes a violation of the Florida Civil Rights Act of 1992, § 760.10(7), Fla. Stat., which makes it an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because such individual has objected to or opposed a practice made unlawful by the FCRA.

136. By engaging in the conduct described herein, Defendant subjected Plaintiff Khorashi to retaliation and ultimately terminated her employment because of her opposition to unlawful practices under the FCRA.

137. As a result of Defendant's unlawful conduct in violation of FCRA, Plaintiff has suffered compensatory damages, including, but not limited to, loss of pay and benefits and other intangible injuries.

138. The conduct of Defendant was willful and wanton, and in such reckless disregard of Plaintiff's rights under FCRA, that Khorashi should additionally be awarded punitive damages.

WHEREFORE, Plaintiff Zohra Khorashi prays this Court will:

A.     Declare that the actions of the Defendant constitute unlawful

discrimination prohibited by the FCRA

B.   Enter judgment in favor of Plaintiff and against the Defendant for violation of Plaintiff's rights under the FCRA;

C.   Award Plaintiff compensatory damages, including, but not limited to, lost wages and benefits, pain, suffering and emotional distress and damage to her professional reputation and career, in such amount as will reasonably compensate her for her losses;

D.   Award Plaintiff punitive damages;

E.   Award Plaintiff her costs, attorneys' fees, and non-taxable expenses in this action pursuant to § 760.11, Fla. Stat.;

F.   Grant Plaintiff such other and further relief as the Court deems equitable, just and proper.

Respectfully submitted,

*Christopher C. Sharp*

Christopher C. Sharp, Esq.
Fla. Bar No. 996858
Email: csharplaw@aol.com
Secondary:  chris@csharplawfirm.com
SHARP LAW FIRM, P.A.
1600 West State Road 84, Suite C
Fort Lauderdale, Florida 33441
Telephone: (954) 909-4246

*Omar Mustafa Saleh*

Omar Mustafa Saleh, Esq.
Fla. Bar No. 091216
Email: osaleh@cair.com
Secondary: saleh@floridalegalconsulting.com
Syed Ahmed Ali Khan, Esq.
Florida Bar No. 061470
Email: akhan@cair.com
COUNCIL ON AMERICAN ISLAMIC RELATIONS
9000 N.W. 44TH Street, Suite 200
Sunrise, FL 33351
Phone: (954) 272-0490

Dated: March 11, 2026          Attorneys for Plaintiff